United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued April 30, 1999 Decided July 13, 1999 

 No. 95-1520

 Exxon Company, U.S.A., 
 Petitioner

 v.

 Federal Energy Regulatory Commission, et al., 
 Respondents

 Tesoro Alaska Petroleum Company, et al., 
 Intervenors

 Consolidated with 
 Nos. 96-1078, 96-1464, 97-1733, 98-1005

 On Petitions for Review of an Order of the 
 Federal Energy Regulatory Commission

 Carter G. Phillips argued the cause for petitioner Exxon 
Company, U.S.A. With him on the joint briefs were Eugene 

R. Elrod, Stephen S. Hill, Stephen F. Smith, Robert H. 
Benna and Jeffrey G. DiSciullo. Clifton D. Harris, Jr., and 
Thomas M. Roche entered appearances.

 Robert H. Benna argued the cause for petitioner Tesoro 
Alaska Petroleum Company. With him on the briefs was 
Jeffrey G. DiSciullo. James C. Reed, Jeanne M. Bennett and 
David S. Berman entered appearances.

 Andrew K. Soto, Attorney, Federal Energy Regulatory 
Commission, argued the cause for respondents. With him on 
the brief were Joel I. Klein, Assistant Attorney General, U.S. 
Department of Justice, John J. Powers, III, and Robert J. 
Wiggers, Attorneys, Jay L. Witkin, Solicitor, Federal Energy 
Regulatory Commission, and Susan J. Court, Special Coun-
sel. David H. Coffman, Attorney, entered an appearance.

 John A. Donovan argued the cause for intervenors Arco 
Alaska, Inc., et al. With him on the brief were Matthew W.S. 
Estes, Bradford G. Keithley, Charles William Burton, Jason 
F. Leif, John W. Griggs, W. Stephen Smith, Randolph L. 
Jones, Jr., Alex A. Goldberg and Richard Curtin. Carolyn Y. 
Thompson, Richard D. Avil, Jr., and Dean H. Lefler entered 
appearances.

 Albert S. Tabor, Jr., John E. Kennedy and S. Scott Gaille 
were on the brief for intervenors TAPS Carriers. Marvin T. 
Griff and Dean H. Lefler entered appearances.

 Before: Ginsburg, Sentelle and Randolph, Circuit Judges.

 Opinion for the Court filed by Circuit Judge Sentelle.

 Sentelle, Circuit Judge: Exxon Company, U.S.A. and 
Tesoro Alaska Petroleum Company petition for review of the 
Federal Energy Regulatory Commission's ("FERC" or 
"Commission") order revising the valuation methodology for 
specified grades of petroleum products after our partial re-
mand of the Commission's earlier order adopting the distilla-
tion method for determining compensation due shippers on 
the Trans Alaska Pipeline System for differences between the 

oil streams injected and oil streams received. See Order 
Modifying and Adopting Contested Settlement Proposal, 
Trans Alaska Pipeline Sys., 65 FERC p 61,277 (1993) ("1993 
Order"), approved in part and remanded in part, OXY USA, 
Inc. v. FERC, 64 F.3d 679, 684 (D.C. Cir. 1995) ("OXY"). In 
the order before us, FERC approved with modifications a 
contested settlement over the objection of petitioners. We 
grant the petition for review in part and vacate and remand 
for further proceedings those parts of FERC's order approv-
ing the use of proxies for the market valuation of one grade of 
petroleum product and the decision to apply the settlement 
prospectively only.

 I. BACKGROUND

 The Trans Alaska Pipeline System ("TAPS") provides the 
only commercially-viable method for moving crude oil pumped 
from the oil fields on Alaska's North Slope to the shipment 
point at Valdez, Alaska, the Alaskan gateway to the world 
market. Several oil companies own interests in various oil 
fields on the North Slope. The oil in those fields differs 
significantly in quality, but the realities of shipping that oil on 
the single pipe of the TAPS requires the blending of the oil 
streams from different fields. Unlike packages shipped by a 
common carrier, the oil streams cannot be segregated during 
shipping, and the blended streams cannot be separated at the 
Valdez end of the pipeline. Instead, at the Valdez end of the 
pipeline, each shipper receives a quantity of the blended 
common stream equivalent to the amount it injected at the 
North Slope end. Companies that inject higher quality crude 
receive oil at the Valdez end of the pipeline identical in 
quality to that received by companies that inject lower quality 
crude oil. The TAPS carriers file tariffs specifying how the shippers
will compensate each other for these differences in quality, 
and their methodology must be approved by the Commission 
pursuant to its authority under the Interstate Commerce Act 
("ICA"), 49 U.S.C.app. s 1 et seq. See also Department of 
Energy Organization Act, Pub. L. No. 95-91, s 402(b), 91 
Stat. 565, 584 (1977), codified at 42 U.S.C. s 7172(b) (1988) 
(repealed 1994), recodified as amended at 49 U.S.C. s 60502 

(transferring authority to regulate oil pipeline rates under the 
ICA from the Interstate Commerce Commission to FERC); 
Exxon Pipeline Co. v. United States, 725 F.2d 1467, 1468 n.1 
(D.C. Cir. 1984) (explaining transfer of authority). TAPS has 
created a system which requires companies injecting lower-
quality oil to compensate companies injecting higher-quality 
oil by creating a "Quality Bank," which awards shippers 
credits for high-quality oil and debits for low-quality oil. The 
TAPS Quality Bank is an arrangement that "makes monetary 
adjustments [among] shippers in an attempt to place each in 
the same economic position it would enjoy if it received the 
same petroleum at Valdez that it delivered to TAPS on the 
North Slope." OXY, 64 F.3d at 684. While this is simple 
enough in concept, determining the relative value of the 
injected streams is in fact a complex technical task. There is 
no independent market to set the relative price of the various 
streams of North Slope crude because the crude is not sold 
until after it is commingled and brought to Valdez. When the 
system was originally created, the relative value of oil was 
determined by the "API gravity"1 of the oil because lighter, 
high-gravity crude is generally more valuable than heavier, 
low-gravity crude. See id. at 685. The "straight-line gravity 
method" measured the gravity of each incoming stream and 
compared it to the gravity of the oil received by that shipper 
at the far end, and determined Quality Bank credits or debits 
accordingly. See id. In 1989, however, OXY USA and 
Conoco, Inc. challenged this methodology, and in 1991 a 
FERC Administrative Law Judge ("ALJ") determined that it 
"no longer yield[ed] a just and reasonable result." 57 FERC 
p 63,010, at 65,049-50, 65,052-53 (1991). (For a full explica-
tion of the proceedings, see OXY, 64 F.3d at 683-89.)

 The majority of North Slope shippers in an attempt to 
settle the tariff dispute proposed abandoning the straight-line 

__________
 1 API gravity is a measure of density created by the American 
Petroleum Institute. Under API gravity analysis, unlike the more 
familiar concept of specific gravity, a higher number indicates a less 
dense crude oil or petroleum product.

gravity method in favor of a "distillation" or "assay" method-
ology, which would value crude oil based on the market price 
of the various component products (called "cuts") created 
when the crude oil is heated to a series of specific tempera-
tures and the evaporated products produced at each tempera-
ture are recondensed. See OXY, 64 F.3d at 687. The five 
cuts created by this process at the lower boiling points--
propane, isobutane, normal butane, natural gasoline, and 
naphtha--and one of the heavier cuts, gas oil, are not at issue 
here, as we upheld the method of valuing those cuts in our 
earlier review. See id. at 701. We vacated and remanded for 
further proceedings as to distillate and residual fuel oil ("re-
sid").

 A. Distillate
 
 Under the original 1993 settlement offer, the distillate cut 
included the portion of the stream that evaporated between 
350 and 650 degrees Fahrenheit. Under the 1993 settlement 
order, FERC split this proposed cut into two cuts, light 
distillate (350-450 degrees) and heavy distillate (450-650 de-
grees). FERC determined that it would price light distillate 
as jet fuel and heavy distillate as No. 2 fuel oil, the products 
into which those cuts are normally refined, without adjust-
ment for processing costs. See 1993 Order, 65 FERC 
p 61,277, at 62,288. We rejected that methodology because 
each cut would require further processing to reach the quality 
required for the proxy product. See OXY, 64 F.3d at 693. 
Because the settlement as modified by FERC essentially 
valued a raw material as if it were a finished product, we 
determined that it overvalued these heavier cuts, resulting in 
a windfall to those shippers whose streams contained the 
highest relative proportion of heavy crude. See id. Although 
we recognized that we could not require FERC to achieve a 
perfect method of valuing petroleum streams, particularly 
streams including cuts without a market, we nonetheless held 
that FERC must be consistent in its methodological choices. 
That is, if the Commission chose to value a portion of the cuts 
at market without adjusting for processing costs, then it 
must, at least "to the extent possible," attempt to approxi-
mate the market value of other cuts without processing. Id. 

at 694. That is, the Commission cannot "consistent with the 
requirement of reasoned decisionmaking, value some cuts 
precisely and others haphazardly." Id. We therefore re-
manded the distillate valuation for further consideration by 
FERC.

 B. Resid
 
 As the name implies, the residual, or "resid," cut consists of 
the portion of the petroleum stream remaining after distilla-
tion of all other cuts at lower boiling points. In the 1993 
settlement order, FERC split the resid into two cuts--light 
resid (1,000 to 1,050 degrees Fahrenheit) and heavy resid (all 
remaining material). The order valued these cuts in relation 
to the market price of proxies: No. 6 fuel oil for light resid 
and FO-380 for heavy resid with no adjustment for the 
processing necessary to receive these market prices. We 
upheld FERC's decision to create a separate light resid cut, 
but vacated the valuation of that cut at the price of No. 6 fuel 
oil as we found that the record did not disclose a relationship 
between the price of that purported proxy and the value of 
the cut. Likewise, we concluded that the record did not 
demonstrate that FO-380 was a reasonable proxy for heavy 
resid because the market price of FO-380 bore only a limited 
and unquantified relation to the value of heavy resid as a 
blending component. See id. at 695. While we concluded 
that expert testimony in the record supported a "conclusion 
that FO-380 and the 1050+ resid share some physical prop-
erties," it did not even suggest that "the two materials have 
equal or even near-equal market values." Id. We therefore 
remanded the valuation of the resid cuts to the agency for 
further proceedings consistent with our opinion.

 In our review of FERC's order approving the 1993 settle-
ment, we rejected not only the specifics of the FO-380 
comparison, but also FERC's decision to value resid based on 
its use as a feedstock for "cokers," refinery equipment which 
breaks resid down even further into lighter fuel products and 
a heavy residue, which might be asphalt at some plants, or 
other materials with differing uses. Exxon and others ar-
gued that resid should be priced at its marginal use value, 

which Exxon claimed was as a blending component for 
FO-380. When remanding, we observed that this economic 
argument, while it might not by itself carry the day, did 
possess enough "analytical force" that the Commission should 
on remand "explicitly address whether the marginal use of 
1050+ resid should be taken into account in that cut's 
valuation methodology." Id.

 C. FERC's Proceedings on Remand
 
 In response to our opinion, FERC initiated settlement 
proceedings regarding these remanded issues. When this 
effort failed, FERC set the matter for hearing. At the same 
time, the Commission's Chief ALJ made further attempts to 
secure a settlement. The parties filed three separate settle-
ment proposals, one by nine parties2 ("the Nine Party Settle-
ment"), and unilateral proposals from Exxon and Tesoro. 
The ALJ provided opportunity for all parties to file materials 
in support of or in opposition to the settlement offers. Fol-
lowing the submissions, the ALJ heard oral argument and the 
parties filed supplemental briefs. See Certification of Con-
tested Settlement and Ruling on Motion to Omit the Initial 
Decision, Trans Alaska Pipeline Sys., 80 FERC p 63,015, at 
65,212-13 ("1997 Opinion").

 The ALJ ultimately certified the Nine Party Settlement to 
the Commission, and opted not to certify the unilateral pro-
posals from Exxon and Tesoro, finding that legal precedent 
required this decision and that in any event the proposals 
were biased in favor of the proposing parties. The ALJ 
reviewed the record in detail and determined that the only 
issues properly before him were the remands for valuation of 
light and heavy distillate and light and heavy resid. He 
found that the Nine Party Settlement's proposed valuations, 
which follow, were fair and reasonable and supported by 

__________
 2 The nine settling parties are Amoco Production Company, 
ARCO Alaska, Inc., BP Exploration (Alaska), Inc., MAPCO Alaska 
Petroleum, Inc., OXY USA, Inc., Petro Star, Inc., Phillips Petrole-
um Company, the State of Alaska, and Union Oil Company of 
California. See 1997 Order, 81 FERC p 61,319, at 62,458 n.5.

record evidence. See 1997 Opinion, 80 FERC p 63,015, at 
65,233.

 Light distillate: valued based on a weighted average of 
 the West Coast and Gulf Coast prices of jet fuel, adjust-
 ed by 0.5 cents per gallon to reflect processing costs.
 
 Heavy distillate: valued based on weighted average of 
 the West Coast price of Waterborne Gasoil, reduced by 1 
 cent per gallon to reflect processing costs and the Gulf 
 Coast price of No. 2 fuel oil reduced by 2 cents per gallon 
 to reflect processing costs. (The processing costs were 
 based on the testimony of Nine Party expert witness 
 John O'Brien who stated that ANS crude oil needed to 
 be processed to reach the 0.5 percent level for sulfur 
 demanded by the market. )
 
 Light resid (1000 degrees F to 1050 degrees F): The 
 1993 settlement had eliminated separate treatment of 
 light resid and combined it with the 1050+ cut. The 
 Nine Party Settlement approved by the ALJ instead 
 rolled it into the Vacuum Gas Oil ("VGO") cut, by raising 
 the top end of that cut to 1050 degrees, which the nine 
 parties claim conforms with industry practice.
 
 Heavy resid (1050+): continued use of the West Coast 
 price of FO-380 as a West Coast reference price, sub-
 tracting 4.5 cents per gallon as a processing cost. Added 
 Gulf Coast 3 percent sulfur No. 6 fuel oil as a Gulf Coast 
 reference product, and adjusted that figure by the same 
 4.5 cents.
 
 The ALJ noted that the nine parties supported the settle-
ment only if it applied prospectively. See id. at 65,241. The 
ALJ determined that the remand did not require that the 
new methodology be applied retroactively and that the Com-
mission retained the discretion to determine when to make 
the settlement effective. See id. at 65,243. The ALJ also 
recommended prospective application under the circum-
stances. See id.

 The Commission reviewed and accepted the ALJ's recom-
mendations as to each valuation, finding in its order that each 

determination was based on substantial evidence. FERC 
found that there was no active market for resid, and opted to 
price resid based on its value as a coker feedstock. FERC 
determined that the two reference products were the actively-
traded petroleum products that had physical characteristics 
most resembling resid, and used these adjusted prices as a 
proxy for the value of resid as a coker feedstock. It also 
decided to apply the new rates prospectively, stating that this 
was consistent with the 1993 Order applying the new rates 
prospectively, which was affirmed by this court in OXY. 
"[The new settlement] does not change the methodology to be 
used, but modifies how to value the remanded cuts." See 
1997 Order, 81 FERC p 61,319, at 62,467. The Commission 
noted that the TAPS Quality Bank was sui generis, so 
precedents cited by Exxon and Tesoro as supporting retroac-
tive application of the new methodology were not dispositive.

 II. STANDARD OF REVIEW

 The standard of review applicable to FERC's approval of 
this proposed settlement of the issues remaining on remand is 
the same as it was in OXY. FERC's decision to approve a 
portion of a contested settlement must be supported by 
substantial evidence, and we must set aside FERC's approval 
if it was "arbitrary, capricious, an abuse of discretion, or 
otherwise not in accordance with law." 5 U.S.C. s 706(2)(A), 
(E). Our inquiry under the arbitrary and capricious test is 
"narrow and a court is not to substitute its judgment for that 
of the agency." Motor Vehicle Mfrs. Ass'n of the United 
States, Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 
(1983). Where, as in the instant case, the analysis to be 
performed "requires a high level of technical expertise, we 
must defer to the informed discretion of the responsible 
federal agencies." Marsh v. Oregon Natural Resources 
Council, 490 U.S. 360, 377 (1989) (internal quotation marks 
omitted). Nonetheless, the Commission must engage in ra-
tional decisionmaking, see, e.g., State Farm, 463 U.S. at 43; 
OXY, 64 F.3d at 690. We held in OXY that the agency had 
supplied a reasoned analysis for changing its prior policies 
when it adopted the distillation methodology. See OXY, 64 

F.3d at 690. However, more important for purposes of the 
petitions now before us, we granted the petitions for review of 
the 1993 Order to the extent that they challenged the Com-
mission's methods of valuing the distillate and resid cuts.

 III. CHALLENGES TO THE NEW SETTLEMENT

 The petitioners make multiple arguments challenging the 
valuation of specific cuts and FERC's failure to require that 
qualitative differences between the same cuts of different 
streams be considered when determining the relative value of 
each stream. They argue that FERC acted arbitrarily by 
failing to value resid based on its marginal use as a fuel oil 
blendstock instead of as a coker feedstock; improperly failed 
to account for differences in quality among the the same cuts 
of different streams when valuing resid; improperly chose a 
price proxy for its value as a coker feedstock; and failed to 
address challenges to the methodology for determining resid's 
value as a coker feedstock. The petitioners also challenge 
FERC's decision to implement the new valuation methodolo-
gy prospectively only. We address first the valuation chal-
lenges, and uphold the agency's decisions as supported by 
substantial evidence with the exception of the use of FO-380 
less 4.5 cents and 3 percent sulfur No. 6 fuel oil less 4.5 cents 
as proxy prices for heavy resid. The adjusted valuation 
solves none of the problems we identified in our prior opinion 
because there is no evidence that the prices of the reference 
products, even after the 4.5 cents adjustment, bear any 
rational relationship to the market value of resid. We there-
fore vacate and remand the portion of FERC's order affect-
ing the valuation of heavy resid.

 IV. INTRA-CUT QUALITY DIFFERENCES

 Exxon3 argues that FERC's failure to account for differ-
ences in quality among the heavy distillate cuts of the individ-
ual streams before they are commingled in the TAPS com-

__________
 3 Exxon and Tesoro filed a joint petition for review. For simplici-
ty's sake, we will refer to the joint arguments of the two petitioners 
as Exxon's arguments.

mon stream violates the terms of our earlier remand in OXY, 
and is arbitrary and capricious. We disagree.

 Petitioners claim that the goal of the Quality Bank is to 
place an accurate value on the streams flowing into the TAPS, 
and failure to account for quality differences in the distillate 
cuts of the streams coming from different oilfields is not 
reasoned decisionmaking. We disagree that Exxon's argu-
ment follows logically from our remand. In OXY, we recalled 
that the goal of the Quality Bank is "to assign accurate 
relative values," 64 F.3d 693 (emphasis added), to the diverse 
streams delivered to the pipeline. We vacated in part the last 
order because the methodology approved therein had favored 
one class of cuts above others. We remanded in order that 
FERC might provide a methodology with a reasoned relative 
uniformity, knowing that absolute precision at any level of the 
cuts was unachievable. That is, we did not remand because 
the old method was inaccurate, but because it was unfairly 
nonuniform. To have demanded 100 percent accuracy would 
have been to hold the agency to "an impossibly high stan-
dard." Id. at 694. The specific purpose in our remand was 
to require the agency to resolve the relative overvaluation of 
some cuts, which were valued at the market price for their 
proxy despite the fact that significant processing was re-
quired to bring those products up to a market standard. 
Exxon seeks to expand the duty of the Commission to refin-
ing the degree of distinction among component streams with-
in individual cuts. Specifically, Exxon seeks to have us 
vacate FERC's order insofar as it does not recognize and 
adjust for differences in the sulfur content of distillate as a 
key factor in determining market value. Part of the adjust-
ment to the per-barrel price of distillate is to account for 
removing sulfur so that it can be sold as jet fuel or No. 2 fuel 
oil. In implementing that methodology, FERC assumed that 
all streams had the same sulfur content, when Exxon had 
shown that such was not the case. Exxon argues that FERC 
should not use the sulfur content of the commingled streams 
when determining the value of the cut, but must determine 
the sulfur content and thus the value of the distillate cut of 
the oil from each field before it enters the common stream. 

Because some streams have a higher sulfur content, they 
would require more processing and consequently have a lower 
value once processing costs were factored into the per-barrel 
price. Other streams with a lower sulfur content would have 
a higher value because no further processing would be needed 
to bring the oil up to the quality of the proxy product.

 Exxon further argues that treating all of the streams as if 
they have the same sulfur content violates OXY, which calls 
for accurately valuing the streams; that it is arbitrary and 
capricious because it makes assumptions contrary to fact; 
and that FERC's failure to even consider the issue is arbi-
trary and capricious. Specifically, Exxon argues that FERC 
improperly determined that the scope of its actions was 
limited by the terms of our remand, but that in any event, 
FERC cannot claim that it addressed only the issues required 
by the court because it did more than we ordered when it 
changed the West Coast proxy for heavy distillate, even 
though no party challenged the one adopted in the 1993 and 
1994 orders, and eliminated the light resid cut, even though it 
was affirmed in OXY. Exxon contends that having opened 
the door, so to speak, FERC was obligated to consider the 
information provided by Exxon and Tesoro about the differ-
ences in quality among the streams because it has an obli-
gation under the ICA " 'to ensure that pipeline rates are just 
and reasonable.' " OXY, 64 F.3d at 690 (quoting Texas 
Eastern Transmission Corp. v. FERC, 893 F.2d 767, 774 (5th 
Cir. 1990)). Exxon argues that refusing to consider the 
quality differences was therefore arbitrary and an abuse of 
discretion. In its 1997 Order, FERC noted that it had 
rejected the same argument in its 1993 Order, and that we 
had not reversed or vacated that ruling. Exxon argues 
nonetheless that by adjusting the market prices of the proxies 
to account for removing sulfur, FERC itself has now deter-
mined that sulfur content is an important aspect of valuing 
heavy distillate.

 We reject Exxon's argument that FERC's failure to differ-
entiate between the streams was arbitrary and capricious. In 
OXY, we required FERC to take into account the significant 
processing costs that rendered its unadjusted use of a proxy 

product unreasonable in relation to the valuation of other 
portions of the stream. Exxon's contention that FERC must 
value each stream at the wellhead based on its individual 
sulfur content calls for more than we required. We did not 
hold in OXY that differences in quality between the streams 
must be considered, and do not do so now. Inherent in our 
approval of FERC's adoption of the distillation methodology 
in OXY was our approval of the agency's conclusion that there 
was no need to consider intra-cut quality differences, and that 
the agency properly determined that the relative proportions 
of the cuts in each stream is sufficiently accurate as a method 
of determining the relative value of the streams. See 65 
FERC p 61,277, at 62,287 (1993), and 66 FERC p 61,188, at 
61,240 (1994). In any event, it was not arbitrary and capri-
cious to determine the value of each cut in the TAPS stream 
after it has been mixed, instead of separately valuing the cuts 
of each stream. The fact that a more precise method exists 
for determining the relative value of the streams does not 
render the decision to adopt a less accurate, but more admin-
istrable, method arbitrary and capricious. FERC has opted 
to use a magnifying glass to determine the values of the 
streams, and we will not fault it for not using a microscope.

 We also uphold against challenge FERC's two changes to 
the price of heavy distillate, both of which are supported by 
the record. FERC changed the reference price for the West 
Coast from No. 2 fuel oil to Waterborne Gasoil, and adjusted 
the price of Waterborne Gasoil by one cent per gallon and the 
Gulf Coast price of No. 2 fuel oil by two cents to account for 
processing. See 1997 Order, 81 FERC p 61,319, at 62,460. 
These adjustments were based on the testimony of expert 
witnesses John O'Brien and Christopher Ross. Ross testified 
that these products most closely resembled Alaskan North 
Slope ("ANS") heavy distillate, see Affidavit of Christopher E. 
Ross, p 19 (Jan. 29, 1997), and O'Brien testified that the ANS 
heavy distillate cut required treatment to reach the necessary 
sulfur level, see Affidavit of John O'Brien, WW 13-15 (Jan. 28, 
1997). These decisions were supported by adequate record 
evidence and we uphold the agency.

 V. RESID CUT VALUATION ISSUES

 A. Exxon and Tesoro's Challenges
 
 In OXY, we noted that resid like distillate did not trade on 
an open market and therefore was difficult to evaluate. 
Nonetheless, and even in the face of "the deference we owe 
the Commission's judgments," we concluded that the 1993 
settlement approach to valuation of resid did not "satisfy the 
APA's basic requirement of reasoned decisionmaking." OXY, 
64 F.3d at 694 (citing State Farm, 463 U.S. at 43). We 
therefore remanded that portion of the assay methodology to 
the Commission for further consideration.

 The method before us in the present review fares no better 
than the last, and for the same reasons: even with the 4.5 
cents per gallon adjustment, "the record demonstrates no 
more than that the price[s] of FO-380 [or No. 6 fuel oil] 
bear[ ] some remote relationship to the value of 1050+ resid 
as a feedstock." Id. at 695. We remand FERC's decision to 
value resid at the price of FO-380 less 4.5 cents on the West 
Coast and Waterborne 3% sulfur No. 6 fuel oil less 4.5 cents 
on the Gulf Coast. The figures derived from the use of these 
proxies with a subsequent adjustment do not bear a demon-
strated relationship to the value of resid, either as a coker 
feedstock or as a blending agent for fuel oil. Exxon and 
Tesoro raise multiple challenges to FERC's valuation process 
for this cut.

 1. Marginal Use
 
 Exxon argues that FERC erred again, as it did in the 1993 
Order in not employing the marginal use of resid as a 
blending agent for fuel oil rather than its value as coker 
feedstock in establishing the valuation methodology for that 
cut. Exxon contends that the error is a fundamental one in 
that the ALJ's finding, adopted by the Commission, that 
there is no active market for resid is flawed. In Exxon's 
view, although there are few trades of resid, there is in fact a 
market, and a sparsity of open trades is only due to the fact 
that the refiners who use resid rarely need to purchase it 
from others because they already obtain it as a byproduct of 

their own refining operation. Exxon further argues that 
there are formulae that can be used to derive resid's value as 
a blendstock despite the absence of market trades. Thus 
Exxon prays the court to vacate the relevant portion of 
FERC's order and remand the controversy for valuing of 
resid as a blendstock.

 FERC responds that there was conflicting evidence regard-
ing the existence of a market for ANS resid, and the ALJ and 
the Commission reasonably adopted the testimony of Nine 
Party witnesses A.L. Gualtieri and Benjamin Klein, who 
testified that resid was rarely traded, and was instead used as 
a coker feedstock. See 1997 Opinion, 80 FERC p 63,015, at 
65,238-41. The ALJ also determined, based on the record, 
that it was inappropriate to value resid based on its marginal 
use as fuel oil blendstock because most of the refineries did 
not seek to purchase resid but created it as part of their 
refinery process. See id. 65,240. The absence of an active 
market for resid made the economic principle of marginal use, 
which depends on a liquid market, unreasonable in this 
circumstance. See id. 65,240-41.

 We see no reason to disturb FERC's adoption of the ALJ's 
determination that resid is best valued based on the market 
value of its constituent products. The expert testimony of 
Klein constitutes substantial evidence in support of FERC's 
decision that marginal use analysis does not require the 
valuation of resid as a blendstock.

 2. Conradson Carbon Residue Content
 
 As with distillate, Exxon argues that FERC arbitrarily 
ignored quality differences in the streams which affect the 
value of the different cuts. The Conradson Carbon Residue 
Content ("CCR") of resid affects its value, and the different 
streams delivered to the TAPS undisputedly have differing 
CCR content. Exxon reiterates the argument it made con-
cerning sulfur that failing to account for differing CCR 
content was arbitrary and capricious. The CCR content 
figure used by FERC was not even derived from the oil 
shipped over TAPS, but from a blend used by an expert 
which included other crude oils. FERC responds that it 

properly rejected the suggested intra-cut differentials based 
on CCR content for the same reasons it rejected the quality 
differentials based on sulfur content. For the reasons stated 
in Parts III and IV above, we hold that FERC was not 
required to consider intra-cut differences in CCR content 
when determining market value.

 3. Choice of Proxies
 
 Exxon next argues that FERC acted arbitrarily when it 
chose to use the adjusted price of FO-380 as a proxy for 
valuing resid as a coker feedstock. In OXY, we found that 
using the unadjusted market price of FO-380 as a proxy was 
arbitrary and capricious. The 4.5 cents adjustment now 
adopted is arbitrary for the same reasons. There is no 
demonstrated relationship between the value of FO-380 and 
coker feedstock other than an observed rough correlation in 
price, and even the data relied on by FERC shows inconsis-
tent relationships in the price of FO-380 and the coker 
feedstock values calculated by the experts. Exxon argues 
that determining resid's value as a coker feedstock "requires 
determining the identity, quantity, and value of products 
produced in a coker from resid and subtracting from the 
value the costs of producing those products and placing them 
in a marketable condition." See Joint Brief of Petitioners 
Exxon Company, U.S.A. and Tesoro Alaska Petroleum Com-
pany at 42. Exxon also argues that FERC chose the wrong 
feedstock to value because it used a blend of crudes which 
would be used by a hypothetical refinery, rather than actual 
individual North Slope crude streams. Exxon further con-
tends that it presented numerous challenges to the methodol-
ogy ultimately adopted by FERC, showing inaccuracies in the 
expert's assumptions regarding cost calculations, product out-
puts and product yields. Finally, it argues that because the 
ALJ never allowed discovery, it could not replicate the ex-
pert's computer modeling on the PIMS system (a standard-
ized petroleum industry modeling system used to calculate 
refinery needs and outputs). The ALJ and the Commission 
did not specifically address these arguments, which Exxon 
contends makes their decisions arbitrary and capricious.

 FERC responds that the 4.5 cents per gallon adjustment to 
the price of FO-380 on the West Coast and No. 6 fuel oil on 
the Gulf Coast as proxies for resid was reasonable, based on 
expert witness O'Brien's testimony and administrative ease. 
These are the lowest-quality products actively traded, and the 
adjustment was within the range of variation between the 
calculated value of resid as a coker feedstock and the per-
gallon price of FO-380. See Ross Affidavit p 21. O'Brien 
derived the calculated value of resid as a coker feedstock 
using the PIMS model and compared those calculated values 
to the market price of FO-380 over the same five-year period. 
The relationship varied from resid being worth $1.21 per 
barrel more than FO-380 in 1993 to being worth $3.01 per 
barrel less than FO-380 in 1995, and averaged being worth 
$1.12 per barrel less over the five-year period. See 1997 
Opinion, 80 FERC p 63,015, at p 65,239 (citing O'Brien Affida-
vit WW 56-598 Exhibit QB ar-23). O'Brien testified that the 
4.5 cents per gallon adjustment (equal to $1.89 per barrel less 
than FO-380) proposed by the Nine Party Settlement fell 
within the observed range of variation over the five-year 
period and was therefore reasonable. See id. FERC also 
notes that Exxon and Tesoro both suggested a method that 
tied the price of heavy resid to FO-380. The difference is 
that Exxon uses a complex formula to adjust the price.4

 B. Analysis

 While we find substantial record evidence supporting the 
intermediate steps FERC took in determining the value of 
resid--i.e., its determinations that no active market exists, 
that resid is best valued as a coker feedstock rather than as a 
blender for fuel oil, and that FO-380 and No. 6 fuel oil are the 
actively-traded products in the relevant markets most similar 
in physical characteristics to resid--we cannot conclude that 
the last step follows logically from these premises. We 

__________
 4 FERC's suggestion that Tesoro and Exxon somehow validated 
their choice of FO-380 as a reference product is misleading because 
Exxon and Tesoro's use of FO-380 as a reference price ties the 
value of resid to the value of FO-380 when valuing resid as a 
blendstock for fuel oil, not as a coker feedstock.

therefore cannot uphold the use of FO-380 less 4.5 cents on 
the West Coast and Waterborne 3% sulfur No. 6 fuel oil less 
4.5 cents on the Gulf Coast as a proxy price for resid.

 The 4.5 cents adjustment, while it falls within the range of 
the observed variation, does no more than that. There is no 
evidence that the prices of the proxy products are more than 
coincidentally related to the value of resid as a coker feed-
stock. Moreover, the calculated value of resid using the 
PIMS model does not even vary consistently with the price of 
FO-380. As petitioners noted when this case was before us 
in OXY, by the same logic we could use the price of coal with 
an adjustment as a proxy for the price of diamonds because 
both are a source of carbon, even if the prices fluctuate 
inconsistently. With only five years' data to consider, the 
sample is too small to convince us that there is some other, 
unstated relationship at work which guarantees that the price 
of FO-380 and the value of resid will correlate consistently 
within some specified range. We recognize that the agency is 
addressing the Quality Bank Administrator's concerns that 
more complex systems may give the appearance that the 
price of resid is open to manipulation, and thus is seeking a 
product that is traded on the market to use as a proxy, which 
would allow the Quality Bank Administrator to perform a 
simple market-based calculation when determining the value 
of resid. These goals of administrative efficiency and objec-
tivity do not free the agency from the requirement that the 
chosen proxy bear a rational relationship to the actual market 
value of resid. We remand once again to the agency to 
determine a logical method for deriving a value for resid. 
Because we remand, we do not reach the technical objections 
Exxon and Tesoro raise regarding specific calculations.

 VI. TESORO'S INDEPENDENT CHALLENGES

 A. Tesoro's Standing
 
 In addition to the arguments raised jointly with Exxon, 
Tesoro raises numerous additional challenges to FERC's 
decision. However, before we address the arguments raised 
by Tesoro in its individual brief, we must consider as a 

threshold matter whether Tesoro has standing to petition us 
for review. Intervenors argue that Tesoro lacks standing 
because it is no longer a shipper on the TAPS system and 
therefore no longer has a legally cognizable stake in the 
outcome. As a result, they argue, the case is moot as to it 
and issues raised only by Tesoro are not properly before us. 
Intervenors also argue that because Tesoro passed its Quality 
Bank costs through to its shippers, it was not aggrieved by 
the orders under review.

 Tesoro counters that it has standing as a competitor of 
MAPCO, one of the shippers on the TAPS system, which is 
subsidized by TAPS because its stream is overvalued. We 
have held that even non-shippers and competitors may be 
within the ICA's zone of interest. See OXY, 64 F.3d at 697. 
Tesoro also notes that it currently purchases ANS crude from 
one supplier and hopes to acquire more from another. Teso-
ro Reply Brief at 19 n.10.

 The Intervenors are correct that only "aggrieved" parties 
may seek judicial review of a final FERC order issued under 
the ICA. See 28 U.S.C. s 2344; OXY, 64 F.3d at 696; Shell 
Oil Co. v. FERC, 47 F.3d 1186, 1200 (D.C. Cir. 1995). We use 
traditional standing principles to determine if a party is 
indeed aggrieved. See OXY, 64 F.3d at 696; Water Transp. 
Ass'n v. ICC, 819 F.2d 1189, 1193 (D.C. Cir. 1987). To be 
aggrieved, Tesoro must have suffered an "injury in fact" 
traceable to FERC's action, a decision in its favor must be 
capable of redressing that injury, and its interest must be 
within the zone of interests protected by the statute. Tesoro 
has shown that it would suffer competitive injury if other 
shippers were advantaged by unfair Quality Bank valuations, 
a decision on our part altering those valuations would redress 
that injury, and the ICA permits a very broad range of 
parties to complain to FERC about pipeline operations. The 
ICA permits the Commission to respond to complaints about 
"anything done or omitted to be done by any common carri-
er" subject to the statute lodged by, inter alia, "[a]ny person, 
firm, corporation, company, or association." 49 U.S.C.app. 
s 13(1). Tesoro has standing to challenge the decision here.

 B. Tesoro's Position
 
 Tesoro marshals additional attacks on FERC's approval of 
the settlement, some technical and some that are arguably 
procedural.

 1. Considering Processing Costs for Only Two Cuts
 
 Tesoro argues that FERC erred in singling out the light 
and heavy distillate cuts for processing cost calculations when 
processing costs associated with other cuts are ignored. It 
argues that this violates the requirement in OXY that streams 
be valued equally. In OXY we remanded the light distillate 
and heavy cuts for new valuation because further processing 
was required before they could be sold as jet fuel and No. 2 
fuel oil respectively. Tesoro now claims that FERC arbi-
trarily ignored the question of whether further processing 
was needed before the other cuts could be sold as the proxy 
products FERC used to value them. Failing to do so, it 
claims, skews the valuation in favor of the heavier streams. 
This argument fails to comprehend our earlier opinion. 
There we upheld the agency's finding that the lighter cuts 
were of sufficiently comparable quality to the market proxies 
that no further processing was needed, and therefore no cost 
adjustment was needed. Essentially, the market price was 
correct because in those instances the distillation method 
resulted in a market-ready product. We will not reexamine 
this issue now. For the reasons given above in Parts III, IV, 
and V.A.2, we do not entertain the argument that quality 
differences between the streams must be considered at this 
stage.

 2. Costs of Sulfur Removal
 
 Tesoro argues that internal inconsistencies in the Nine 
Party data show that the processing costs for sulfur removal 
are not credible, specifically because there is a higher per-
unit cost to remove sulfur from heavy distillate than from 
resid. Tesoro presented evidence challenging these calcula-
tions, which the ALJ and FERC failed to fully address.

 FERC responds that Tesoro's argument that there are 
inconsistencies in O'Brien's cost calculations for sulfur remov-

al was never raised before the Commission, and cannot be 
raised now before the court. If the issue was preserved, the 
agency argues that Tesoro has produced no evidence showing 
that the calculations are incorrect, and that the agency could 
reasonably have adopted O'Brien's calculations.

 We hold that Tesoro preserved this issue for review when it 
argued before the Commission that there was "no way, 
absent discovery, to determine that O'Brien's cost estimates 
are not totally arbitrary" and that the conflicting testimony of 
its experts supported a lower cost per unit for removing 
sulfur. Motion of Tesoro Alaska Petroleum Company for 
Expedited Reconsideration and Remand or to Permit Appeal 
Concerning Certification of Nine Party Settlement WW 36-37 
(Oct. 15, 1997). As for the merits of the issue, we hold that 
FERC reasonably relied on the testimony of Nine Party 
witness O'Brien in reaching the adjustment. Witness O'Brien 
testified that different methods would be needed to bring the 
two products into compliance. Heavy distillate could be 
blended with a lighter product to bring it into compliance 
with the 0.5% market tolerances for sulfur in West Coast 
Waterborne Gasoil, the reference product on the West Coast. 
However, such blending would not be economically feasible to 
bring it down to the 0.2% sulfur content of Gulf Coast No. 2 
fuel oil, the Gulf Coast reference product, so it would have to 
be processed to remove the excess sulfur. See 1997 Opinion, 
80 FERC p 63,015, at 65,234; O'Brien Affidavit WW 13-15. 
This difference in approach accounts for the difference in 
cost. Thus, there is no inconsistency warranting the relief 
Tesoro seeks.

 3. Processing Costs for Light Distillate
 
 Tesoro argues that FERC arbitrarily and capriciously ac-
cepted the Nine Parties' processing cost adjustment for light 
distillate. Tesoro argues that its expert testified that no 
further processing was required for light distillate to meet 
the requirements for jet fuel, the proxy product used for 
valuation of the light distillate cut. FERC arbitrarily accept-
ed the Nine Parties' experts' claims that 0.5 cents per gallon 
in processing was required before the cut would meet the 

standard. Tesoro also argues that its expert pointed out 
unreasonable additions to the cost of the processing, such as 
unnecessary pumping and inflated administrative costs, and 
that FERC accepted this flawed estimate without considering 
contrary evidence and thus failed to satisfy the substantial 
evidence standard. We find this objection to be without 
merit. There is substantial record support for the Commis-
sion's determination that a 0.5 cent/gallon adjustment was 
required to account for the processing of light distillate into 
jet fuel. That evidence consisted of expert testimony before 
the ALJ by Nine Party witness O'Brien supporting the 
processing costs figures eventually adopted by the ALJ and 
thereafter by the Commission. See Reply Comments of the 
Nine Settling Parties in Support of the Nine Party Settle-
ment at 4-5 (Mar. 17, 1997).

 4. Coker Feedstock Value Based on Improper Assump-
 tions and Calculations Not in the Record
 
 Tesoro next argues that FERC ignored substantial and 
important criticism of the coker valuation of resid. Under 
the adopted method, resid's coker feedstock value is deemed 
to be the value of the products created less the cost of 
processing. Tesoro argues that the other experts' opinions 
were based on the wrong mix of product yields, that the 
PIMS model used is not in the record, and that Tesoro's 
expert could not replicate the results. Tesoro also argues 
that its expert showed that the coker operating costs used by 
the Nine Parties' experts were overstated. Because the 
PIMS model is not in the record, FERC could not make a 
rational connection between the facts and the conclusions 
drawn therefrom.

 Given that we are remanding the question of valuation of 
resid because FERC has not provided a reasoned explanation 
for its determination to set resid's value as a coker feedstock 
and to use FO-380 less 4.5 cents on the West Coast and 
Waterborne 3% sulfur No. 6 fuel oil less 4.5 cents on the Gulf 
Coast as a proxy price, we need not decide this detailed 
factual question, as the factual record may change on remand. 
FERC will necessarily address these issues when it revalues 

resid, and such complex technical questions belong first to the 
informed discretion of the agency. See OXY, 64 F.3d at 691.

 5. Eliminating the Fuel Oil Cut
 
 Tesoro argues that FERC improperly eliminated the light 
resid cut and determined that the 1000-1050 degree cut 
should be valued as VGO. (We had previously affirmed 
FERC's creation of the light resid cut, but had remanded for 
new valuation.) The Nine Parties had suggested this change, 
and FERC approved it. Tesoro argues that the new cut is 
beyond the capability of many refineries. It suggests that 
the ALJ was confused when he determined that this change 
was consistent with the Commission's treatment of this cut.

 FERC reasonably found, in resolving this technical matter, 
that the record evidence supports a determination that "the 
standard industry cut point shown on assays is 1050